SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------X

CAINKADE CORP.,

                              Plaintiff,

          -against-                                   **SUMMONS**

ANGEL LIN and FACEBOOK, INC.,
                                                      INDEX NO.:
                              Defendant.

-----------------------------------------------------------------X

To the Above-Named Defendants:

    YOU ARE HEREBY SUMMONED to answer the complaint in this action and to serve a

copy of your answer, or, if the complaint is not served with this summons, to serve a notice of

appearance, on the Plaintiff's Attorney within twenty (20) days after the service of this

summons, exclusive of the day of service, (or within thirty (30) days after service is complete if

this summons is not personally delivered to you within the State of New York); and in case of

your failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the complaint.

Dated:    New York, New York
        March 27, 2015


                LAW OFFICE OF ANDREW M. WONG
                Attorneys for Plaintiff
                Cainkade Corp.

        By:    _Andrew M. Wong_
                Andrew M. Wong
                444 East 86th Street, Suite 21C
                New York, New York 10028
                (212) 772-6285
                andrew.m.wong@verizon.net

TO:   Angel Lin
      Defendant
      Facebook, Inc.
      1 Hacker Way
      Menlo Park, CA  94025

      Facebook, Inc.
      Defendant
      770 Broadway
      New York, N.Y.  10003

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------X

CAINKADE CORP.,

                          Plaintiff,

                                                    VERIFIED
          -against-                                 COMPLAINT

ANGEL LIN and FACEBOOK, INC.,
                                                    INDEX NO.:
                          Defendants.

------------------------------------------------------------------X

　　　　Plaintiff Cainkade Corp., by the Law Office of Andrew M. Wong, its attorney, as and for

its complaint against defendants Angel Lin and Facebook, Inc. alleges as follows:

NATURE OF ACTION

　　　　1.　　　This is an action for preliminary and permanent injunctive relief to prevent

defendants Angel Lin and Facebook, Inc. from continuing to cause irreparable harm to plaintiff

Cainkade Corp. and for damages to redress injuries suffered by plaintiff, all as a result of

wrongful actions undertaken by defendants.  These wrongful actions constitute breach of

contract, breach of duty of loyalty, and tortious interference with contract relations.

PARTIES

　　　　2.　　　Plaintiff Cainkade Corp. ("Cainkade") is a New York corporation with a principal

place of business located at 39 West 29th Street, 11th Floor, New York, New York.  Cainkade is

engaged the software, technology and product design and development business.

　　　　3.　　　Defendant Angel Lin ("Lin") is an individual who is currently a California

resident but who formerly resided at 360 Furman Street #911, Brooklyn, New York.  Upon

1

information and belief, Lin is currently employed by defendant Facebook, Inc. and has a

business address of 1 Hacker Way, Menlo Park, California.

    4.      Facebook, Inc. ("Facebook") is a Delaware corporation duly authorized to

conduct business in the state of New York with a New York office located at 770 Broadway,

New York, New York.

JURISDICTION AND VENUE

    5.      This Court has jurisdiction over defendant Lin in that she was a resident of New

York at the time she entered into the contract in question in this action and thus she transacted

business in New York within the meaning of CPLR 302(a).  Additionally, this Court has

jurisdiction over this action pursuant to the terms of a written agreement between the parties in

which defendant Lin agreed that her employment with plaintiff Cainkade would be governed by

the laws of the State of New York and that any dispute arising out of her employment would be

adjudicated in New York, New York.

    6.      This Court has jurisdiction over defendant Facebook in that it is duly authorized

to conduct business in New York, it maintains an office and employees in New York and as such

it transacts business in New York within the meaning of CPLR 302(a).

    7.      Venue is proper pursuant to the terms of a written agreement between the Lin and

Cainkade in which defendant Lin agreed that any dispute arising her employment agreement

would be settled in the state or federal courts located in New York County, New York.  New

York County was chosen within the agreed to parameters because it is the principal place of

business of plaintiff Cainkade and at the time she was hired by Cainkade, Lin was a resident of

New York.  Additionally, defendant Facebook maintains an office and employs people for that

office in New York County.  Thus, New York County is the most appropriate and convenient

venue for all parties involved in this case.

## GENERAL ALLEGATIONS

8.      Cainkade was founded in 2007 and it is in the business of providing software design and development for clients ranging from two person start-ups to Fortune 50 companies.

9.      In March 2014 Cainkade entered into a business relationship with Facebook whereby Cainkade would provide technical design services on an ongoing basis. These services entailed the creation and modification of schematics and graphical materials for use in the company's products and services.

10.      Under this arrangement, Cainkade would provide two of its employees to work on the Facebook project at Facebook's Menlo Park, California office and at Cainkade's office in Oakland, California. These two would continue to be employees of Cainkade.

11.      After a couple of months the parties agreed that the relationship was working well and was mutually beneficial. Facebook was very pleased with the work being done by the Cainkade employees on its project. When Facebook expressed interest in adding another designer to the project Cainkade offered to find someone to fill that position.

12.      Lin had been working with Cainkade as an independent contractor since 2013. Lin resided in New York during this period and she had worked on several Cainkade projects including assignments with Johnson & Johnson, Comcast, Amazon.com and other companies. Cainkade thought that Lin would be a good candidate to join its Facebook project team so Cainkade arranged in June 2014 for Lin to meet with Facebook.

13.      Facebook thought that Lin had good credentials but was skeptical that she was a good fit for the project. Cainkade extolled Lin's credentials and her performance on Cainkade's projects when she was an independent contractor. To accept Lin, Facebook requested a discounted rate for her assignment, during which time Facebook would assess her performance

and evaluate whether she would continue on the project.  Facebook agreed to have Lin join the project.

14.     Lin was finishing an independent contractor assignment for Cainkade in July 2014 and intended to replace her with another full-time designer in the last quarter of 2014.  At this time Cainkade offered to change Lin's status from independent contractor to full-time employee of Cainkade.

15.     On August 1, 2014 Cainkade hired Lin to be a full-time employee with the position of Associate UX Director.  In this position Lin was to lead design projects with clients, mentor junior members of the Cainkade team and correspond and communicate directly with clients.  Lin resided in New York at the time of Cainkade hired but Cainkade assisted Lin in temporarily relocating Cainkade corporate housing in the San Francisco bay area so that she could fulfill the requirements of her Cainkade assignment with Facebook.

16.     Pursuant to her job offer, Lin received the following three documents from Cainkade:

(a)     an Offer Letter dated August 1, 2014 ("Offer Letter").  A copy of the Offer Letter is attached hereto as Exhibit A;

(b)     Confidentiality, Proprietary Information and Inventions; Non-Solicitation Agreement ("Non-Solicitation Agreement").  A copy of the Non-Solicitation Agreement is attached as Exhibit B; and

(c)     a Proprietary Information and Inventions Agreement  ("Proprietary Information Agreement").  A copy of the Proprietary Information Agreement is attached hereto as Exhibit C.

17.     Lin signed each of these documents thereby acknowledging that she had read and
agreed to the terms and conditions set forth in each document as binding on her employment
relationship with Cainkade.  See Exhibits A, B and C.

18.     Among her obligations to Cainkade as expressed in these documents, Lin was
prevented from taking a job with any Cainkade client that she had any involvement with during
her time as an employee of Cainkade for at least 12 months from the date she left her job at
Cainkade.   This prohibition included Facebook because Lin had been involved with this
Cainkade client during her time working for Cainkade.  The Non-Solicitation Agreement,
expressly states that:

> 10.     **Non-Solicitation of Clients.**  While I am employed by the
> Company (Cainkade), I will not engage in any other business
> activity, for present or future consideration, whether for a client of
> the Company or other third party, without the prior written consent
> of the Company.  Additionally, during the first 12 months after
> termination of My employment with the Company for any reason
> whatsoever (the "Restriction Period"), I will not, in competition
> with the Company, either directly or indirectly (meaning through
> an entity) accept employment or business from, render services to
> or solicit business of any actual or prospective client or account
> that I had involvement with as an employee of the Company.
> Exhibit B.

19.     This provision was designed to protect Cainkade's legitimate business interests,
including but not limited to, its investment of time, money and other resources in that employee
and guarding its relationship with the client and the benefits it gained from that relationship.
Moreover, the Non-Solicitation Agreement also provides for enforcement of its terms should Lin
violate them:

> 12.     **Enforcement.**  The Company shall be entitled, if it so
> elects, to institute and prosecute proceedings in any court of
> competent jurisdiction to obtain damages for and to enjoin the
> violation by Me (Lin) of any provision hereof, to enforce the
> specific performance by Me of any provision hereof, and to obtain
> reimbursement of its attorneys' fees for any breach of this

5

Agreement as a result of My willful misconduct or negligence. I agree that the damages that may be suffered by the Company as a result of such violation would be difficult to ascertain. Accordingly, I agree that in the vent of a breach by Me, the Company shall be entitled to preliminary relief, including injunctions enjoining Me from violating such provisions pending the outcome of any proceeding, and I shall pay to the Company, in addition to My other obligations to the Company and to other remedies available to the Company, an amount equal to 12 months gross compensation payable to be pursuant to my Employment Agreement based upon the monthly gross compensation immediately preceding My violation of this Agreement. I further agree that in the event of an impending or threatened breach by Me of this Agreement, the Company shall be entitled to preliminary relief, including injunctions enjoining Me from violating such provisions pending the outcome of any proceedings. The remedies referred to above shall not be deemed to be exclusive of any other remedies available to the Company to enforce the performance of the covenants and agreements contained in this Agreement.
Exhibit B.

20.     While performing services for Cainkade in California, Lin resided in a Cainkade corporate apartment at "The Uptown" apartment building two blocks from Cainkade's Oakland, California offices. Cainkade arranged for all utilities including Internet service, water, garbage collection and electricity at this apartment. It also purchased furniture for the apartment and arranged for its delivery. Cainkade directly paid all of the fees associated with this apartment during Lin's assignment at Facebook.

21.     Lin's employment with Cainkade began on August 1, 2014. Lin was supposed to start on the Facebook project on August 4 but delays in logistics in her travel to California caused her to start on August 11, 2014.

22.     On the morning of November 21, 2014 a Facebook employee called Cainkade to notify Cainkade that Lin had asked Facebook about full-time employment directly with Facebook. Lin had made this inquiry without Cainkade's knowledge or permission and in direct violation of her obligations under the Non-Solicitation Agreement. Facebook sought a reaction

from Cainkade as to whether Cainkade would be amenable to Linn joining Facebook full-time. This was a very surprising because Cainkade had expected for the several previous months that Lin would be returning full-time to New York where she resided on a permanent basis prior to the Facebook assignment, and to work full-time out of Cainkade's New York office.

23.    Cainkade responded to Facebook by telling the company that hiring Lin would (a) be harmful to Cainkade by limiting its ability to work with Facebook in the future for fear of other of its employees being hired away by Facebook; and (b) Cainkade expected Facebook to honor a verbal commitment it made to Cainkade in March 2014 at the beginning of the working partnership that Facebook would not hire Cainkade's employees.

24.    Later in the day on November 21, 2014, Lin apparently learned that Cainkade had been informed of her request to join Facebook and she attempted to justify and defend her actions knowing that she was in violation of her Non-Solicitation Agreement obligations. Lin sent an e-mail to Cainkade in which she told Cainkade that Facebook had approached her with the idea of her coming to work for Facebook. This was in direct contradiction to what Facebook had told Cainkade (that Lin had approached Facebook about this possibility) and appeared to lie in order to avoid her contractual obligations to Cainkade.

25.    Cainkade also made Facebook aware of Lin's contractual obligations to Cainkade by sending Facebook a copy of the Non-Solicitation portion of Lin's agreements. As stated above, the Non-Solicitation Agreement signed by Lin prevents her from going to work for Facebook for at least one year after she leaves Cainkade.

26.    After the parties were aware of the rights and obligations it appeared that the matter was resolved and on December 5, 2014 Facebook inquired about extending Lin's contract. At this time Lin also told Cainkade that she was considering several options for her

future but that she preferred to stay employed at Cainkade and that she would extend her contract to continue to work at Facebook through Cainkade.

27.     Cainkade subsequently learned in February 2015 that Facebook, in fact, was proceeding to hire Lin as a full-time Facebook employee rather than extend Lin's contract through Cainkade. This was done despite Facebook knowing of Lin's obligations to Cainkade under the Non-Solicitation Agreement. Discussions between Facebook and Cainkade about this situation continued. Facebook initially delayed Lin's start date but then allowed her to start work at Facebook on March 9, 2015. This was in clear violation of Lin's contractual obligations to Cainkade. Attempts by the parties to resolve this situation were unsuccessful and Cainkade was forced to file this lawsuit to protect its interests.

FIRST CAUSE OF ACTION
BREACH OF CONTRACT
(As Against Lin)

28.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 27 hereof with the same force and effect as if set forth herein at length.

29.     The Non-Solicitation Agreement between Cainkade and Lin constitutes a valid and binding written contract.

30.     Cainkade has performed all of its obligations to Lin under the terms of the Confidentiality Agreement except for all of those obligations that it could not perform due to the acts or omissions of Lin as set forth in this Complain.

31.     Lin has breached and continues to breach her obligations under the Non-Solicitation Agreement by accepting employment with and working at Facebook, a client of Cainkade and an account at which Cainkade placed Lin and she had direct involvement with while an employee of Cainkade, less then 12 months after she left her job with Cainkade.

8

32.     As a direct and proximate result of Lin's breach of the Non-Solicitation Agreement, Cainkade has sustained and will incur further damages, including but not limited to lost business, lost profits, damage to its goodwill, and the costs of hiring and retaining current and new employees, in amounts to be proven at trial.  Cainkade is also entitled, under the terms of Lin's contracts, to recover its attorney's fees and costs associated with having to bring this action to enforce its rights against Lin because of her breach.  Cainkade has also suffered and will continue to suffer immediate and irreparable harm, and will continue to suffer such injuries until Lin's breach is preliminarily and permanently enjoined.

SECOND CAUSE OF ACTION
BREACH OF DUTY OF LOYALTY
(As Against Lin)

33.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 32 hereof with the same force and effect as if set forth herein at length.

34.     During her employment with Cainkade, Lin owed Cainkade a duty of loyalty. This duty obligated Lin to devote her time and attention during business hours to the business of Cainkade, to refrain from engaging in activities that competed with Cainkade or went against Cainkade's interests.

35.     Lin breached her duty of loyalty to Cainkade by engaging in the acts described above, most significantly her discussions of and acceptance of employment with Facebook in violation of her Non-Solicitation Agreement.

36.     As a direct and proximate result of the breaches of the duties described herein, Cainkade has suffered general, special and consequential damages, including but not limited to damages reflecting Cainkade's loss of revenue and profits, its costs associated with hiring and retaining new employees, and damage to its goodwill, all in an amount to proven at trial.

37.     The aforementioned wrongful conduct was intentional, malicious, and in bad faith and has subjected and will continue to subject Cainkade to unjust hardship in conscious disregard of Cainkade's rights, so as to justify an award of exemplary and punitive damages.

THIRD CAUSE OF ACTION
TORTIOUS INTERFERENCE WITH
CONTRACTUAL RELATIONS
(As Against Facebook)

38.     Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 37 hereof with the same force and effect as if set forth herein at length.

37.     A valid and enforceable contract relationship existed between Cainkade and Lin. This is evidenced by the Offer Letter, the Confidentiality Agreement and the Non-Solicitation Agreement described more fully above.

39.     Facebook knew that Lin had this contractual relationship with Cainkade.

40.     Despite knowing of the contractual relationship between Cainkade and Lin, Facebook intentionally interfered with this relationship by hiring Lin with the full knowledge that doing so would cause Lin to breach her legal obligations to Cainkade.  Facebook has wrongfully interfered with Cainkade's contractual rights by inducing Lin to breach her contract with Cainkade.

41.     As a direct and proximate result of this wrongful conduct by Facebook, Cainkade has suffered general, special and consequential damages, including but not limited to damages reflecting Cainkade's loss of revenue and profits, its costs associated with hiring and retaining new employees, and damage to its goodwill, all in an amount to proven at trial.  Cainkade has suffered and will continue to suffer immediate and irreparable harm, and will continue to suffer such injury until the breaches are preliminarily and permanently enjoined.

10

42.     Facebook's wrongful acts and conduct as described above were willful, oppressive, fraudulent, and malicious, and Cainkade is therefore entitled to punitive damages according to the proof presented at trial.

WHEREFORE, Cainkade demands judgment as follows:

a.      Compensatory damages in an amount to be determined at trial;

b.      Consequential damages in an amount to be determined at trial;

c.      Punitive damages in an amount to be determined at trial;

d.      Temporary, preliminary and permanent injunctive relief enjoining and restraining Lin from working for Facebook for a period of one year following the end of her employment with Cainkade;

e.      Attorney's fees and costs incurred by Cainkade in bringing and prosecuting this action;

f.      Such other relief as the Court may deem just and proper under the circumstances.


<u>JURY DEMAND</u>

Cainkade demands a trial by jury on all issues in this action.


Dated:          New York, New York
                March 27, 2015

                                LAW OFFICE OF ANDREW M. WONG
                                Attorneys for Plaintiff
                                Cainkade Corp.


                        By:     *Andrew M. Wong*
                                Andrew M. Wong
                                444 East 86th Street, Suite 21C
                                New York, New York 10028
                                (212) 772-6285
                                andrew.m.wong@verizon.net

VERIFICATION

STATE OF NEW YORK )
                                ss:
COUNTY OF NEW YORK )

      I, Jeremy Landis, being duly sworn, depose and say:

      I am an officer of plaintiff Cainkade Corp. in the within action.

      I have read the foregoing Complaint and know the contents thereof; the same is true to my own knowledge, except as to the matters therein alleged upon information and belief, and that as to those matters I believe to be true.

                                                _____
                                                JEREMY LANDIS

Sworn to before me this
27th day of March, 2015

_____
      Notary Public

ANDREW M. WONG
Notary Public - State of New York
No. 02W06118693
Qualified in New York County
My Comm. Expires Nov. 15, 2008
Feb. 2, 2017

Case 1:15-cv-03418-JSR Document 1-1 Filed 05/01/15 Page 15 of 30
INDEX NO. 152989/2015
NYSCEF DOC. NO. 2
RECEIVED NYSCEF: 03/27/2015

# cainkade

1 Aug 2014

Dear Angel,

We are delighted to present to you this Offer of Employment to join Cainkade as an Associate UX Director. The most important element to the growth of our company is to build our organization with the right people. We think you will be an important part of the team and we are looking forward to working with you. Please do not hesitate to reach out with any questions or to discuss this offer further.

Thank you,

Jeremy Landis

**cainkade**

| | |
|---|---|
| **Start Date** | Your anticipated start date is Aug 1, 2014. |
| **Employer** | You will work from Cainkade Corp. offices at 39 W 29th St 11FL, NY, NY 10001. The Company may change your position, duties, and work location, as it deems necessary. |
| **Position and Status** | Associate UX Director, Full-time (exempt). |
| **Compensation** | Base salary will be $122,500 per year ($10,208.33 per month), less payroll deductions and all required withholdings, paid in accordance with our standard payroll schedule (Currently semi-monthly). All employees are eligible for annual bonuses. Bonuses are discretionary and are based on the performance of the employee and the overall performance of the Company. |
| **Insurance/Medical** | You will be eligible to participate in the health, dental, and vision insurance programs as they are made available to all employees of the Company. |
| **Vacation** | Our current policy awards up to ten (10) days of vacation per year, exclusive of Company holidays, the scheduling of which shall be with the prior approval of the Company. Vacation is accrued at the rate of 3.33 hours per pay period. Vacation time must be used in the calendar year accrued and will not carryover to a subsequent year. |
| **Personal Days** | The Company will award you three personal days per year on your Start Date. |

_(handwritten above Compensation: 125,000)_

# cainkade

| | |
|---|---|
| **Proprietary Information and Inventions Agreement** | As a condition to your relationship with the Company, you will be required to sign and abide by the Company's Proprietary Information and Inventions Agreement, which prohibits unauthorized use or disclosure of the Company's proprietary information. |
| **Employee Manual** | You will be expected to comply with the Company's personnel policies, as set forth in the Employee Manual.  Company policies are subject to revision from time to time and such revisions shall be binding upon you, with the sole exception that the policies of at-will employment and binding arbitration can only be modified in a writing signed by both you and the President of the Company.  Once received, please sign the Receipt and Acknowledgement and return to the Company. |
| **Arbitration** | In the event of any dispute or claim relating to or arising out of your employment relationship with the Company, this agreement, or the termination of your employment with the Company for any reason (including, but not limited to, any claims of breach of contract, defamation, wrongful termination or age, sex, sexual orientation, race, color, national origin, ancestry, marital status, religious creed, physical or mental disability or medical condition or other discrimination, retaliation or harassment), you and the Company agree that all such disputes shall be fully resolved by confidential, binding arbitration conducted by a single arbitrator through the American Arbitration Association ("AAA") under the AAA's National Rules for the Resolution of Employment Disputes then in effect, which are available online at the AAA's website at www.adr.org.  You and the Company hereby waive your respective rights to have any such disputes or claims tried before a judge or jury. |
| **Immigration Reform and Control Act of 1986** | You also must establish your identity and authorization to work as required by the Immigration Reform and Control Act of 1986 (IRCA) by completing the IRCA's Employment Verification Form (I-9) within three days of the Start Date. |

**cainkade**

| | |
|---|---|
| **Additional Terms of Employment** | You will be expected to abide by Company rules and regulations. Your employment at the Company is "at-will" as a full-time contractor. You may terminate your employment with the Company at any time and for any reason whatsoever simply by notifying the Company. Likewise, the Company may terminate your employment at any time and for any reason whatsoever, with or without cause or advance notice. No one other than the President of the Company has the authority to alter this arrangement, to enter into an agreement for employment for a specified period of time, or to make any agreement contrary to this policy, and any such agreement must be in writing and must be signed by the President of the Company and by the affected employee. |

# cainkade

This letter, together with your Proprietary Information and Inventions Agreement and Employment Agreement, forms the complete and exclusive statement of your employment with the Company. The employment terms in this letter supersede any other agreements or promises made to you by anyone, whether oral or written. This letter agreement cannot be changed except in a writing signed by you and a duly authorized officer of the Company.

Please sign and date this letter, and return it to me if you wish to accept employment at the Company under the terms described above.

We look forward to your favorable reply and to a productive and enjoyable work relationship.

Sincerely,

Jeremy Landis, President

Accepted:

_____                    8/06/2014

**Angel Lih**                               Date

Case 1:15-cv-02418-JSB   Document 1-1   Filed 05/01/15   Page 20 of 30

# CONFIDENTIALITY, PROPRIETARY INFORMATION
## AND INVENTIONS;
## NON-SOLICITATION AGREEMENT
## FOR EMPLOYEES

_____ Angel Lin _____, ("I" or "Me"), hereby recognize that Cainkade Corp., a New York corporation with its principal office at 39 West 29th Street, New York, NY, and its worldwide subsidiaries and affiliates (collectively hereinafter referred to herein as the "Company"), are engaged in the business of designing and maintaining software solutions across a broad range of industry sectors. I understand that it is My responsibility as an employee of the Company to assist the Company in fulfilling its business objectives. I understand the importance of protecting the Company's rights to all of its proprietary and confidential information, adhering to the highest of business and ethical standards, and rigorously complying with applicable laws, rules and regulations. Therefore, in consideration of the compensation that has been paid and will be paid in the future and My employment by the Company, I hereby agree as follows:

1.    **Confidential Information.** Confidential Information includes all of the Company's inventions; research and development; know-how; processes and algorithms; source and object codes; trade secrets; financial and business strategies, information and policies; computer systems, software, hardware, electronic communications and documentation; products, services and methodologies; the names of and relationship with clients, investors and strategic partners; sales and marketing materials, client proposals, contracts and deliverables; confidential, proprietary or trade secret information submitted to the Company by clients, investors, employees, consultants or co-venturers with the Company for study, evaluation or use; and any other information not generally known to the public which, if misused or disclosed, could adversely affect the business of the Company. Confidential Information does not include information which was in My possession or was known to Me directly or indirectly prior to My employment with the Company.

2.    **Protection of Confidential Information.** During and after My employment with the Company, I will (1) use Confidential Information only as may be necessary and proper to perform My duties for the Company; (2) keep in strictest confidence and trust all Confidential Information that is disclosed to Me or to which I have access; (3) comply with all applicable policies and standard procedures established by the Company to maintain the secrecy and confidentiality of Confidential Information; (4) not, directly or indirectly, without the prior written consent of the Company, copy, disseminate or otherwise disclose Confidential Information to any person or entity; and (5) not, other than in the proper performance of My duties, remove any tangible Confidential Information from the premises where such information is kept. I will provide all reasonable assistance that the Company requests to maintain the secrecy and confidentiality of Confidential Information. I will also notify the Company promptly of the date of, and the circumstances involved in, the loss or unauthorized disclosure, if any, of any of the Confidential Information.

3.    **Work Product.** "Work Product" means any idea, invention, discovery, development, design, technique, process, methodology, improvement, plan, work of authorship, computer

program, source and object code, data, information, enhancement or other work product, whether or not patentable, copyrightable or protectable, developed, conceived, reduced to practice or learned within or outside the normal course of My employment by the Company and related to, connected with or arising out of any current or prospective business or activities of the Company.

4.     **Duties to Protect My Work Product for the Company**.  I will disclose to the Company all of My Work Product.  Any Work Product which is eligible for copyright protection shall be deemed a "work for hire," and the Company shall be the sole owner of all right, title and interest in such Work Product, with the full and unrestricted right to make any modifications thereto.  The provisions of this section do not apply to My Work Product if it (1) was developed entirely on My own time; (2) was not made with the use of Confidential Information or any equipment, supplies, or facilities of Company; (3) is unrelated, directly or indirectly, to the business of Company; and (4) did not result from any work performed by Me for the Company.

5.     **Assignment of Work Product**.  If any Work Product is deemed for any reason not to be a "work for hire," I hereby irrevocably assign to the Company all right, title and interest in and to My Work Product and shall, at the expense and on behalf of the Company, do everything reasonably necessary for the Company to obtain, preserve, and protect the Company's right, title and interest in and to My Work Product.  This will include preparing and signing all documents the Company may deem necessary to obtain and maintain patents, copyrights, trade secrets, trademarks, service marks and other rights anywhere in the world. This obligation shall be binding upon Me or My legal representative and continue beyond the termination of My employment with the Company, subject to reasonable compensation by the Company for My time and expenses.  Should the Company be unable, after reasonable effort, to obtain My signature on any document necessary to apply for or prosecute any of the above rights for any reason, I hereby irrevocably designate and appoint the Company or its officers and agents as My agent coupled with a power of attorney to act on My behalf to do everything necessary to accomplish the above.

6.     **Previous Work Product**.  I will disclose below all Work Product that has been generated, conceived, first reduced to practice, developed or otherwise learned by Me, alone or jointly with others, prior to or during the tenure of My employment by the Company and, by doing so, remove it from the applicability and operation of this Agreement upon acknowledgement and consent of the Company, not to be unreasonably withheld:

_____

_____

_____

My signing this Agreement shall be My representation and warranty that the above list is complete as of the date hereof and that any other Work Product is subject to this Agreement unless explicitly excluded by written agreement between the Company and Me.

7.     **Duty of Loyalty**.  I acknowledge that I owe a duty of loyalty to the Company and, while employed, will use My best efforts to promote and serve the interests of the Company,

giving at all times the full benefit of My knowledge and expertise. I hereby represent that, at the time of My employment and as of the date hereof, I have no interest or other rights, duties or obligations which are inconsistent with or in conflict with the business of the Company, except as disclosed below:

_____

_____

_____

I will notify the Company immediately should any conflict of interest arise during My employment.

8.      **Confidentiality of Previous Employers**.  The duties and obligations of this Agreement do not breach any agreement to keep in confidence information acquired by Me prior to the execution of this Agreement.  I have not entered into and will not enter into any agreement in conflict with this Agreement.  I have not brought and will not bring to the Company or use in the performance of My duties at the Company any materials or documents of any former or current employer, client, or business partner that are not generally available to the public, unless I have obtained express written authorization to do so from the employer, client, or business partner.

9.      **Delivery of Materials Upon Employment Termination**.  Upon termination of My employment with the Company for any reason whatsoever, I shall, immediately, deliver to the Company all documents, papers and any other information, regardless of form, format or medium, in My possession or control which relate to, are connected with or arise out of My employment, and I shall not be entitled to or retain any copies thereof.  I will also return all other Company property, including, but not limited to, computers, keys, supplies, identification cards, credit cards and other Company property that may be in My possession at My place of work or elsewhere, including any property of a client of the Company in My possession.  Upon termination of My employment with the Company, I will make no further use of such Confidential Information whatsoever.

10.     **Non-Solicitation of Clients**.  While I am employed by the Company, I will not engage in any other business activity, for present or future consideration, whether for a client of the Company or other third party, without the prior written consent of the Company.  Additionally, during the first 12  months after termination of My employment with the Company for any reason whatsoever (the "Restriction Period"), I will not, in competition with the Company, either directly or indirectly (meaning through an entity) accept employment or business from, render services to or solicit the business of any actual or prospective client or account that I had involvement with as an employee of the Company.

11.     **Non-Solicitation of Employees**.  I will not, during My employment or for a period of 12 months after its termination, either personally or by an agent and either on My own account or for or in association with any other person, directly or indirectly solicit, endeavor to entice away or induce to breach their contract of employment, or offer employment to any employees of the Company or its affiliates with whom I have worked in the year prior to the termination of My employment.

12.     **Enforcement**.  The Company shall be entitled, if it so elects, to institute and prosecute proceedings in any court of competent jurisdiction to obtain damages for and to enjoin the violation by Me of any provision hereof, to enforce the specific performance by Me of any provision hereof, and to obtain reimbursement of its attorneys' fees for any breach of this Agreement as a result of My willful misconduct or negligence.  I agree that the damages that may be suffered by the Company as a result of any such violation would be difficult to ascertain.  Accordingly, I agree that in the event of a breach by Me, the Company shall be entitled to preliminary relief, including injunctions enjoining Me from violating such provisions pending the outcome of any proceeding, and I shall pay to the Company, in addition to all of My other obligations to the Company and to other remedies available to the Company, an amount equal to 12 months gross compensation payable to Me pursuant to My Employment Agreement based upon the monthly gross compensation immediately preceding My violation of this Agreement.  I further agree that in the event of an impending or threatened breach by Me of this Agreement, the Company shall be entitled to preliminary relief, including injunctions enjoining Me from violating such provisions pending the outcome of any proceedings.  The remedies referred to above shall not be deemed to be exclusive of any other remedies available to the Company to enforce the performance or observation of the covenants and agreements contained in this Agreement.

13.     **General**.  This Agreement is not assignable by Me.  It may, however, be assigned by the Company to any entity or subsidiary created by it and/or to any entity who may acquire it or with whom the Company may merge.  It will be governed by and construed in accordance with the laws of the State of New York without applying the conflicts of laws rules of that state.  All disputes, claims or conflicts arising from this agreement shall be settled in the state or federal courts located in New York County, New York; provided, however, the Company may seek relief under Section 12 through any court of competent jurisdiction.  The rights, duties and obligations of this Agreement shall survive the termination of My employment by the Company in any capacity and shall inure to the benefit of and shall be binding upon My heirs and personal representatives and the successors of the Company.  Should any part of this Agreement be found by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall not be affected and shall be valid and enforced to the fullest extent permitted by law.  This Agreement is the entire agreement between Me and the Company relating to the subject matter hereof because all prior written or oral promises or representations are incorporated in this Agreement.  No amendments or modifications of this Agreement will be binding upon Me or the Company unless in writing and signed by both Me and the Company.

Accepted and agreed to

this _06_ day of _August_, 20_14_.

_____
Signature

_ANGEL LIN_
Name

Case 1-15-cv-03418-JSR Document 1-1 Filed 05/01/15 Page 24 of 30

**cainkade**

## STATEMENT REGARDING
## PROPRIETARY INFORMATION AND INVENTIONS ASSIGNMENT AGREEMENT

Attached to this statement is your Proprietary Information and Inventions Assignment Agreement (the "**Agreement**") with Cainkade Corp., a New York corporation (the "**Company**").

Please take the time to review the Agreement carefully. It contains material restrictions on your right to disclose or use, during or after your services to the Company, certain information and technology learned or developed by you (either alone or jointly with others) during your time with the Company. The Company considers this Agreement very important to the protection of its business.

If you have any questions concerning the Agreement, you may wish to consult an attorney. Managers, legal counsel and others in the Company are not authorized to give you legal advice concerning the Agreement.

If you have read and understand the Agreement, and if you agree to its terms and conditions, please return a fully executed copy of it to the Company, retaining one copy for yourself.

**REVIEWED AND UNDERSTOOD:**

By: _____

Name: _____ANGEL LIN_____

Title: _____ASSOCIATE UX DIRECTOR_____

Date: _____08/06/2014_____

«Name»

## PROPRIETARY INFORMATION AND INVENTIONS ASSIGNMENT AGREEMENT

In consideration of my employment by Cainkade Corp., a New York corporation (the "**Company**"), or for my serving as an officer thereof, and other good and valuable consideration the receipt of which is hereby acknowledged, I agree as follows:

**1.** **Employment or Other Services.** I have been or am about to be employed (or otherwise retained) by the Company to work in the position of [*List below*] (the "**Relationship**"). I understand and acknowledge that this agreement ("**Agreement**") does not expand upon any rights I may have to continue in the employ of, or in a consulting relationship with, or the duration of my employment or consulting relationship with, the Company under any existing agreements between the Company and me or under applicable law. I understand that unless I have a written agreement signed by an officer of the Company stating otherwise, the Relationship is not for any particular period, and this Agreement is not an employment contract. I may quit at any time with or without cause, and the Company may terminate the Relationship at any time with or without cause.

**2.** **Proprietary Information.**

(a) For purpose of this Agreement, "**Proprietary Information**" means any and all information, ideas and materials, in whatever form, tangible or intangible, pertaining in any manner to the business of or used by the Company (including, without limitation, any person or entity owned by, controlled by or affiliated with the Company) or to any other person or entity to whom or which the Company owes a duty of confidentiality, and includes, but is not limited to, any trade secret, technical know-how, information, knowledge or data relating to the Company's past, present, planned or foreseeable business, as more fully described in Exhibit A.

(b) Often, Proprietary Information will be stamped or otherwise marked "Confidential," "Proprietary," or with some similar designation. If any information or material is not so marked, however, and it meets the definition in the foregoing paragraph 2(a), it is still Proprietary Information. If I am uncertain as to whether particular information or materials are Proprietary Information, I will request the Company's written opinion as to their status. I understand that Proprietary Information does not include any information, idea or material (i) that is disclosed to me without confidential or proprietary restriction by a third party who rightfully possesses the information, ideas or materials (without confidential or proprietary restriction) and did not learn it, directly or indirectly, from the Company, (ii) that was rightfully in my possession or part of my general knowledge prior to the commencement of the Relationship, or (iii) that is or becomes publicly known or is legitimately in the public domain through lawful means and without breach of this Agreement by me. Any information, idea or material will not be considered to be publicly known or in the public domain merely because it is embraced by more general information in my prior possession or the possession of others, or merely because it is expressed in public literature in general terms.

(c) I recognize that the Company has received and in the future will receive confidential or proprietary information from third parties subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

(d) I also acknowledge that all information generated, received or maintained by or for me on the premises or equipment of Company (including, without limitation, computer systems and electronic or voice mail systems) is Proprietary Information and the sole property of Company, and I hereby waive any property or privacy rights I may have with respect to such information.

**3.** **Restrictions on Use and Disclosure.** I will not, during or at any time after the termination of my Relationship with the Company, use or reproduce any Proprietary Information, except for the benefit of the Company. I also will not disclose or deliver, directly or indirectly, any Proprietary Information to any person or entity, except in the course of performing my duties to the Company and with the Company's consent, obtained in accordance with the Company's procedures. I will use my best efforts to prevent the unauthorized reproduction, disclosure or use of Proprietary Information by others.

**4.** **Procedure for Obtaining Authorization for Information Disclosure.** I understand that from time to time the Company may issue written instructions explaining how I may obtain authorization for the disclosure of

Proprietary Information outside of the Company, advice as to the confidential status of information, and approval to enter into non-disclosure agreements. I agree to familiarize myself with these instructions promptly when they are issued or revised and to follow them.

     **5.**    **Return of Materials.**  Upon termination of my Relationship with the Company for whatever reason, or at any other time at the Company's request, I will immediately deliver to the Company all documents, data, notebooks, records and other information (including any copies) in my possession or under my control, whether prepared by me or by others, that contain, constitute or relate in any way to Proprietary Information. I further agree not to use thereafter any Proprietary Information for my benefit or the benefit of others.

     **6.**    **Creations.**

     (a)  I hereby assign, and agree to assign, to the Company, without additional compensation, my entire right, title and interest in and to all Creations (which term will include, but not be limited to, creations, inventions, works of authorship, ideas, processes, technology, formulas, software programs, writings, designs, discoveries, modifications and improvements), whether or not patentable or reduced to practice and whether or not copyrightable, that are made, conceived or developed by me (either alone or jointly with others), or result from or are suggested by any work performed by me (either alone or jointly with others) for or on behalf of the Company or its affiliates, (i) during the period of my Relationship with the Company, whether or not made, conceived or developed during regular business hours or (ii) after termination of my Relationship if based on Proprietary Information. I agree that all such Creations are the sole property of the Company or any other entity designated by it, and, to the maximum extent permitted by applicable law, any copyrightable Creation will be deemed a work made for hire. Notwithstanding the foregoing, Creations shall not include items listed on Exhibit B or to the extent that applicable law lawfully prohibits the assignment.

     (b)  Included in this assignment is an assignment of all benefits, privileges, causes of action and remedies relating to the Creations, whether before or hereafter accrued (including, without limitation, the exclusive rights to apply for and maintain all such registrations, renewals and/or extensions; to sue for all past, present or future infringements or other violations of any rights; and to settle and retain proceeds from any such actions); and all "moral rights," "artist's rights," "droit moral," or the like (collectively "Moral Rights"). To the extent I retain any such Moral Rights under applicable law, I hereby ratify and consent to any action that may be taken with respect to such Moral Rights by or authorized by the Company and agree not to assert any Moral Rights with respect thereto.

     (c)  I agree to disclose promptly and fully in writing to the Company and to hold in confidence for the sole right, benefit and use of Company, any and all Creations made, conceived or developed by me (either alone or jointly with others) during my Relationship with the Company, or within six months after the termination of my Relationship with the Company if based on Proprietary Information. Such disclosure will be received and held in confidence by the Company. In addition, I agree to keep and maintain adequate and current written records on the development of all Creations made, conceived or developed by me (either alone or jointly with others) during the Relationship or during the six-month period following termination of my Relationship with the Company, which records will be available to and remain the sole property of the Company at all times.

     (d)  I agree that I will, at the Company's request, promptly execute a written assignment of title for any Creation required to be assigned by this Paragraph 6. I further agree to perform, during and after my Relationship with the Company, all acts deemed necessary or desirable by the Company to permit and assist it, at its expense, in obtaining and enforcing the full benefits, enjoyment, rights and title throughout the world in the Creations assigned to the Company pursuant to this Paragraph 6. Such acts may include, but are not limited to, execution of documents and assistance or cooperation in legal proceedings. I also hereby irrevocably appoint the Company and any of its officers as my agent and attorney in fact to undertake such acts in my name, and I waive and quitclaim to Company any and all claims of any nature whatsoever that I may now have or may later have for infringement of any intellectual property rights in the Creations. The Company will compensate me at a reasonable rate for time actually spent by me at the Company's request on such assistance at any time following termination of my Relationship with the Company.

     **7.**    **Prior Creations.**  All inventions, works of authorship, ideas, plans, projects, information, processes, technology, formulas, software programs, writings, designs, discoveries, materials created, collected or compiled (in any form, including written and electronic), patents, copyrights, trademarks or trade secrets, or any claims, rights or modifications or improvements to the foregoing, if any, that I made, conceived, developed or first reduced to practice

(either alone or jointly with others) prior to my Relationship with the Company and which are listed on Exhibit B (collectively, "Prior Creations") are excluded from the scope of this Agreement.  I represent and covenant that set forth on Exhibit B attached hereto is a complete list of all such Prior Creations that are owned by me, either alone or jointly with others, and I understand that by not listing an invention, work of authorship, discovery, modification, improvement or other creation I am acknowledging that such creation was not made, conceived or developed before commencement of my Relationship with the Company.  I agree to notify the Company in writing before I make any disclosure to, or perform any work on behalf of, the Company that appears to conflict with proprietary rights I claim in any Prior Creation.  If I fail to give such notice, I agree that I will make no claim against the Company with respect to any such Prior Creation.  If, in the course of my Relationship with the Company, I incorporate into Company property an invention owned by me or in which I have an interest, the Company is hereby granted a nonexclusive, royalty-free, irrevocable, perpetual, sublicensable and transferable license throughout the universe to make, use, import, sell, copy, distribute, display, perform (whether or not publicly) such invention as part of and in connection with the Company property.

8.    **Confidential Information of Others.**  I will not use, disclose to the Company or induce the Company to use any confidential, proprietary or trade secret information or material belonging to others which comes into my knowledge or possession at any time, nor will I use any such information or material in the course of my Relationship with the Company.  Except as disclosed on Exhibit B to this Agreement, I have no other agreements or relationships with or commitments to any other person or entity that conflict with my obligations to the Company, and I represent that my service to the Company will not require me to violate any obligation to or confidence with another.  In the event I believe that my work at the Company would make it difficult for me not to disclose to the Company any confidential, proprietary or trade secret information or materials belonging to others, I will immediately inform my supervisor.  I have not entered into, and I agree I will not enter into, any oral or written agreement in conflict with this Agreement.

9.    **Other Obligations.**  I acknowledge that the Company from time to time may have agreements with other persons or entities, including the United States government or agents thereof, which impose obligations or restrictions on the Company regarding inventions made during the course of work thereunder or regarding the confidential nature of such work.  I agree to be bound by all such obligations and restrictions of the Company under such agreements.

10.    **Conflicting Engagement.**  During my Relationship with the Company and for one (1) year thereafter, I will not engage in any other employment or activity relating to the business in which the Company is now or may hereafter become engaged, or which would otherwise conflict with my obligations to the Company, without the prior written consent of the Company.

11.    **Business Relationships.**  I acknowledge that the Company's relationships with its employees, customers, vendors and service providers are valuable business assets.  I agree that, during my Relationship with the Company and for one (1) year thereafter, I will not, directly or indirectly (for myself or for any third party), as an employee, employer, consultant, agent, principal, partner, manager, stockholder, officer, director, or in any other individual or representative capacity, without the Company's express written consent, (i) engage or participate in any business that is competitive with the business of the Company; and/or (ii) solicit or attempt to solicit (A) any employee, independent contractor or consultant of the Company to terminate his or her relationship with the Company in order to become an employee, consultant or independent contractor to or for any other person or entity; and/or (B) the business of any client or customer of the Company (other than on behalf of the Company) with a product that is considered by the Company to be competitive with its current or planned line of products and services.  Notwithstanding the foregoing, I may own less than two percent (2%) of any class of stock or security of any corporation that competes with the Company listed on a national securities exchange.

12.    **Remedies.**  I recognize that nothing in this Agreement is intended to limit any remedy of the Company under prevailing law governing the protection of trade secrets, and that I could face possible criminal and civil actions resulting in imprisonment and substantial monetary liability if I misappropriate the Company's trade secrets.  In addition, I acknowledge that it may be extremely difficult to measure in money the damage to the Company of any failure by me to comply with this Agreement, that the restrictions and obligations under this Agreement are material, and that, in the event of any failure, the Company could suffer irreparable harm and significant injury and may not have an adequate remedy at law or in damages.  Therefore, I agree that if I breach any provision of this Agreement, the Company will be entitled to the issuance of an injunction or other restraining order or to the enforcement of other equitable remedies against me to compel performance of the terms of this Agreement without the necessity of showing

or proving it has sustained any actual damage.  This will be in addition to any other remedies available to the Company in law or equity.

13.   **Waiver of Limitations.**  I waive the benefit of any statute of limitations affecting my liability under this Agreement or the enforcement of the Agreement to the full extent permitted by law.

14.   **No Waiver by Conduct or Prior Waiver.**  A party's delay, failure or waiver of any right or remedy under this Agreement will not impair, preclude, cancel, waive or otherwise affect such right or remedy or any subsequent rights or remedies that may arise.

15.   **General Provisions.**  This Agreement constitutes the entire agreement between the Company and me relating generally to the same subject matter, replaces any existing agreement entered into by me and the Company relating generally to the same subject matter, and may not be changed or modified, in whole or in part, except by written supplemental agreement signed by me and the Company.  I agree that any subsequent change in my duties or compensation will not affect the validity or scope of this Agreement.  If any provision of this Agreement is held invalid or unenforceable, the remainder of this Agreement will not fail on account thereof but will otherwise remain in full force and effect.  If any obligation in this Agreement is held to be too broad to be enforced, it will be construed to be enforceable to the full extent permitted by law.  The obligations of this Agreement will continue beyond the termination of my Relationship and will be binding upon my heirs, executors, assigns, administrators, legal representatives and other successors in interest.  This Agreement will inure to the benefit of the Company, its successors, assigns and affiliates.  This Agreement will be governed by and construed in accordance with the laws of the State of New York, without giving effect to its conflict of law rules.  This Agreement may be signed in two counterparts, each of which will be deemed an original and both of which will constitute one agreement.

I ACKNOWLEDGE THAT I HAVE READ AND THAT I UNDERSTAND ALL THE PROVISIONS OF THIS AGREEMENT, A COPY OF WHICH HAS BEEN DELIVERED TO ME.  BY SIGNING THIS DOCUMENT, I AGREE TO BE BOUND BY ALL ITS TERMS.

**CAINKADE CORP.**                                          **[NAME]**

By: _____                    By: _____

Name: JEREMY LANDIS

Title: PRESIDENT

Date: _____8/6/2014_____                         Date: ___08/06/2014___

## EXHIBIT A

### EXAMPLES OF PROPRIETARY INFORMATION

Proprietary Information includes, but is not limited to, any of the following types of information, ideas and materials:

any trade secret; technical know-how; information; data; knowledge; idea; design; formula; instrument; product; machinery; project; equipment; document; file; photograph; computer printout; drawing; sketch or other visual representation; data processing or computer software technique; program or system; mechanical or other invention; improvement; discovery; composition; process; part of a process; manufacturing technique; book; notebook; paper; compilation of information; record; specification; operating method; patent disclosure or patent application; list or other written record used in the Company's business; budgets, financial data and other information regarding the Company's financial condition; compensation and other terms of employment of the Company's employees and consultants; names and practices of any customers or potential customers of the Company and its affiliates; names, marketing methods, operating practices and related data regarding the Company's existing and potential vendors, suppliers, distributors, joint venture partners, and affiliates; the marketing methods and plans of the Company and its affiliates, licensors and licensees and related data and prices at which the Company obtains or has obtained, or at which it sells or has sold, its products or services; research, development, manufacturing and sales plans, costs and receipts of the Company; and any other information, ideas or materials relating to the past, present, planned or foreseeable business, products, developments, technology or activities of Company.

## EXHIBIT B

## PRIOR KNOWLEDGE OF PROPRIETARY INFORMATION; PRIOR CREATIONS; PRIOR COMMITMENTS

**1.   Proprietary Information.**  Except as set forth below, I acknowledge that at this time I know nothing about the business or Proprietary Information of the Company, other than information I have learned from the Company in the course of being hired or retained:

_____

_____

_____

(Check here _____ if continued on additional attached sheets)

**2.   Prior Creations.**  Except as set forth below, there are no creations, inventions, works of authorship, ideas, plans, projects, information, processes, technology, formulas, software programs, writings, designs, discoveries, materials created, collected or compiled (in any form, including written and electronic), patents, copyrights, trademarks or trade secrets, or any claims, rights or modifications or improvements to the foregoing, that I have made, conceived, developed or first reduced to practice (either alone or jointly with others) prior to my Relationship with the Company, that are owned by me, alone or jointly with others, and which I desire to exclude from the operation of the Agreement.  I represent and warrant that the following is a complete and current list of all Prior Creations:

_____

_____

_____

(Check here _____ if continued on additional attached sheets)

**3.   Prior Agreements/Commitments.**  Except as set forth below, there are no agreements or relationships with or commitments to any other person or entity that conflict with my obligations to the Company or under the Agreement.  I represent and warrant that the following is complete and current list of all such agreements, relationships or commitments:

_____

_____

_____

(Check here _____ if continued on additional attached sheets)

By:       _____

Name:   Angel Lin

Title:     Associate UX Director

Date:    08/06/2014